No. 23-1501

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

—————————

NANTUCKET RESIDENTS AGAINST TURBINES; VALLORIE OLIVER,

*Plaintiffs-Appellants*,

v.

U.S. BUREAU OF OCEAN ENERGY MANAGEMENT; NATIONAL MARINE FISHERIES SERVICE; DEBRA HAALAND, Secretary of the Interior; GINA M. RAIMONDO, Secretary of Commerce; VINEYARD WIND 1, LLC,

*Defendants-Appellees*

—————————

On Appeal from the United States District Court for the District of Massachusetts, No. 1:21-cv-11390-IT (Hon. Indira Talwani)

—————————

## INTERVENOR-DEFENDANT-APPELLEE'S BRIEF

| | |
|---|---|
| David T. Buente, Jr. | Jack W. Pirozzolo (No. 61887) |
| Peter C. Whitfield | Sidley Austin LLP |
| James R. Wedeking | 60 State Street, 36th Floor |
| Kathleen Mueller | Boston, MA 02109 |
| Brooklyn Hildebrandt | (617) 223-0304 |
| Sidley Austin LLP | jpirozzolo@sidley.com |
| 1501 K Street, N.W. | |
| Washington, DC 20005 | |

*Counsel for Vineyard Wind 1 LLC*

November 20, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iii

Rule 26.1 Corporate Disclosure Statement ................................ v

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ........................................... 2

STATEMENT OF THE ISSUES ............................................... 3

STATEMENT OF THE CASE .................................................. 3

    A.    Statutory Background............................................. 3

    B.    Factual Background ............................................... 3

    C.    Proceedings in the District Court.......................... 8

STANDARD OF REVIEW...................................................... 8

SUMMARY OF ARGUMENT ................................................. 9

ARGUMENT ...................................................................... 10

I.    Federal Defendants Used the Best Scientific and Commercial Data Available and Their Interpretations of that Data are Afforded Significant Deference ....................................... 10

    A.    The Biological Opinion Considered The Quintana-Rizzo Study ................................................................... 12

    B.    The Biological Opinion Considered the "Key Outcomes Memorandum" and Entanglement Risks, The "2020 Annual Report Card," And The "2020 Stock Assessment." ............... 16

    C.    The Biological Opinion Considered the Stober Paper And Properly Analyzed The Potential Impacts From Operational Noise ................................................................. 18

II.    The Administrative Record Supports The Conclusion That The Project, With The Mitigation Measures, Is Not Likely To Jeopardize North Atlantic Right Whales ....................... 19

    A.    Residents' Challenges To The Monitoring And Clearance Zones Are Both Waived and Without Merit. ......................... 19

B.    Mitigation Measures Will Avoid Level A Harassment and Minimize Level B Harassment ...............................................25

C.    The Mitigation Measures Ensure That Project Vessels Will Not Strike Right Whales........................................................27

D.    Residents Provide No Basis to Contest the "Soft Start" Procedure...................................................................................27

E.    Residents' Argument that Federal Defendants Failed to Establish an Adequate Baseline Misreads the District Court's Opinion and Lacks a Record Basis...........................29

F.    The 2021 Biological Opinion Includes an Appropriate Recovery Analysis ................................................................31

CONCLUSION ......................................................................................32

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Fisheries of Me., Inc. v. Daley,*
  127 F.3d 104 (1st Cir. 1997) ................................................................. 8

*Balt. Gas & Elec. Co. v. NRDC,*
  462 U.S. 87 (1983) .............................................................................. 19

*Bos. Redev. Auth. v. Nat'l Park Serv.,*
  838 F.3d 42 (1st Cir. 2016) .................................................................. 8

*City of Taunton v. EPA,*
  895 F.3d 120 (1st Cir. 2018) .............................................................. 26

*Hoolahan v. IBC Advanced Alloys Corp.,*
  947 F.3d 101 (1st Cir. 2020) .............................................................. 11

*Housatonic River Initiative v. EPA,*
  75 F.4th 248 (1st Cir. 2023) ................................................................ 9

*Lovgren v. Locke,*
  701 F.3d 5 (1st Cir. 2012) .................................................................. 11

*Maine Loberstermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
  70 F.4th 582 (D.C. Cir. 2023) ..................................................... 12, 17

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) .............................................................................. 9

*Miccosukee Tribe of Indians v. United States,*
  566 F.3d 1257 (11th Cir. 2009) .......................................................... 12

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.,*
  947 F. Supp. 2d 1031 (D. Alaska 2013) ............................................. 25

*NRDC v. Pritzker,*
  62 F. Supp. 3d 969 (N.D. Cal. 2014), *rev'd and remanded
  by* 828 F.3d 1125 (9th Cir.) ............................................................... 24

*Town of Norfolk v. U.S. Army Corps of Eng'rs*,
    968 F.2d 1438 (1st Cir. 1992) ................................................................ 8

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990) ................................................................ 20

*Upper Blackstone Water Pollution Abatement Dist. v. EPA*,
    690 F.3d 9 (1st Cir. 2012) ................................................................ 9, 19

*Vasquez-Rivera v. Figueroa*,
    759 F.3d 44 (1st Cir. 2014) ................................................................ 20

*Water Keeper All. v. U.S. Dep't of Def.*,
    271 F.3d 21 (1st Cir. 2001) ................................................................ 20

## Statutes

16 U.S.C. § 1421h ................................................................ 30

16 U.S.C. § 1536 ................................................................ 10

16 U.S.C. § 1540 ................................................................ 20

## Other Authorities

50 C.F.R. § 402.14 ................................................................ 10

iv

**Rule 26.1 Corporate Disclosure Statement**

Intervenor-Defendant-Appellee Vineyard Wind 1 LLC ("Vineyard Wind") is jointly owned 50% by Copenhagen Infrastructure Partners, P/S, and 50% by Avangrid Renewables, LLC. No publicly held corporation has a 10% or greater ownership interest in Vineyard Wind.

## INTRODUCTION

Vineyard Wind 1 LLC ("Vineyard Wind") spent nearly a decade designing the nation's first commercial offshore wind energy project (the "Project") and obtaining the necessary state and federal approvals to construct and operate it. Located on the outer-continental shelf about 14 nautical miles south of Martha's Vineyard and Nantucket Island, the Project will be capable of generating 800 megawatts of electricity, enough to power 400,000 Massachusetts homes. Before approving the Project, the Federal Defendants conducted an extensive environmental review under the National Environmental Policy Act ("NEPA")—a multi-year process that provided multiple opportunities for public comment. They also consulted with the National Marine Fisheries Service ("NMFS") under the Endangered Species Act ("ESA") to ensure that the Project is not likely to jeopardize the continued existence of any threatened or endangered species. As a result of these reviews and public input, Vineyard Wind modified the Project in several respects and Federal Defendants imposed various regulatory conditions to protect the environment and the endangered North Atlantic right whale in particular. Among other things, Vineyard Wind reduced the number of

wind energy turbines and has been implementing numerous mitigation measures to protect North Atlantic right whales from harm from pile driving noise, entanglement with fishing gear, and vessel strikes.

Appellants are an advocacy group and the group's founding member, Vallorie Oliver, who lives on Nantucket Island (collectively, "Residents"). Residents assert that the Federal Defendants violated NEPA, the ESA, and the Administrative Procedure Act by issuing the Final Environmental Impact Statement ("Final EIS") and Biological Opinion for the Project's construction and operations plan.

The District Court granted summary judgment to the Federal Defendants and Vineyard Wind in a well-reasoned 52-page opinion that is firmly grounded in the law and amply supported by the administrative record. That judgment should be affirmed because Residents have provided no valid reason to disturb the District Court's findings.

## STATEMENT OF JURISDICTION

Vineyard Wind adopts the Federal Defendants' Statement of Jurisdiction.

## STATEMENT OF THE ISSUES

Vineyard Wind adopts the Federal Defendants' Statement of the Issues.

## STATEMENT OF THE CASE

**A.** <u>Statutory Background</u>

Vineyard Wind adopts Federal Defendants' description of the statutory background.

**B.** <u>Factual Background</u>

Vineyard Wind adopts Federal Defendants' description of the factual background and adds a further description of the binding terms and conditions that the Bureau of Ocean Energy Management ("BOEM") imposed to mitigate any potential impacts of construction and operation of the Project on the North Atlantic right whale ("NARW" or "right whale"). *See* Fed. Br. at 8-14. These terms and conditions include:

- <u>Seasonal restrictions that limit pile driving</u> to months when right whales are less likely to be in the Project area. These restrictions prohibit pile driving from January 1 through April 30 and permit pile driving in December only with BOEM's approval and pursuant

3

to a plan of enhanced procedures to minimize the risk of exposing right whales to pile-driving noise. SA_0394; SA_1778;

- <u>Time and weather restrictions</u> that limit pile driving to times when visibility is clear. Among other restrictions, pile driving may not commence until at least one hour after sunrise, and it may not commence within 1.5 hours before sunset. Additionally, pile driving may only commence when clearance zones are fully visible (i.e., not obscured by darkness, rain, fog, etc.) for at least 30 minutes. Vineyard Wind must also develop and implement measures for enhanced monitoring in the event that poor visibility conditions unexpectedly arise and stopping pile driving would risk human safety or pile instability. SA_0395; SA_1778-79;

- <u>Clearance and shutdown zones</u> to avoid pile driving when right whales are present. The zones must be monitored by protected species observers ("PSOs") and passive acoustic monitoring ("PAM"), and the size varies depending on the type of monitoring, the time of year, and the type of pile being installed. Clearance zones must be monitored for 60 minutes prior to the commencement of pile driving, and pile driving may not commence unless the zones

are free of right whales for 30 minutes immediately before pile driving. If pile driving has commenced, it must cease if a right whale is detected within the shutdown zone (unless stopping pile-driving would risk human safety or pile instability, in which case reduced hammer energy must be used where practicable). SA_0399-402; SA_1784-88. A "PSO must treat a NARW visually detected at any distance from the pile-driving vessel as a detection that triggers the required pre-construction delay or shutdown during pile installation, regardless of the minimum distance from the clearance or shutdown zone." SA_0399. In addition, "a PAM detection (75% confidence) of a NARW within the PAM clearance zone must be treated as a visual detection, triggering a delay in pile driving." SA_0038.

- Requirements that PSOs and PAM operators be trained and independent. PSOs and PAM operators must have completed a training program and been approved by NMFS. PSOs may not have any Project-related tasks other than to observe, collect and report data and communicate with and instruct vessel crew regarding the presence of protected species and mitigation requirements. They

must have suitable equipment and good vantage points for visual monitoring, and there are limits on how many hours they can work to limit fatigue. SA_0395-96; SA_1779-80;

- A Pile-Driving Monitoring Plan must be developed by Vineyard Wind (and approved by BOEM and NMFS) with information on PSOs and PAM, including descriptions of all equipment, procedures and protocols. SA_0397; SA_1781;

- Soft start for pile driving. Vineyard Wind must begin pile driving with the "soft start" process in which the first three hammer strikes are at reduced energy, followed by a 1-minute interval, and the process is repeated three times to alert any unobserved whales that might be within the clearance zones and provide them with time to leave;

- Noise attenuation equipment must be used to reduce how far pile driving noise travels. Vineyard Wind is using trained construction contractors to install a "hydro sound damper" and two "bubble curtains" around the perimeter of each pile for the full depth of the water column to create bubbles that act as a barrier to sound transmission. Vineyard Wind must conduct field tests on the initial

foundations to verify that the equipment is effective. SA_0398-99; SA_1783-84, SA_0518; SA_0061; SA_0022-23. Based on the results of the field tests, NMFS may adjust the size of the clearance zones. SA_0038;

- Weekly pile driving reports of PSO and PAM monitoring activities must be submitted to NMFS and BOEM documenting pile-driving activities and detections of any marine mammals or sea turtles. SA_0403; SA_1789;

- Speed limits for Project vessels. Project vessels must travel at speeds less than or equal to 10 knots when they are transitioning to, from, or within the wind development area between November 1 and May 14, or any time a NMFS-designated Right Whale Slow Zone or Dynamic Management Area is in effect, except that crew transfer vessels may transit faster if they have dedicated observers to watch for whales and Passive Acoustic Monitoring. SA_0392-93; SA_1773-74.; and

- Vessel strike avoidance measures. If a right whale is observed, a vessel must reduce its speed and maintain a distance of 500 meters from any whale.  SA_0393-94; SA_1775.

**C.** Proceedings in the District Court

Vineyard Wind adopts Federal Defendants' description of the procedural history and the district court's decision.

## STANDARD OF REVIEW

Vineyard Wind agrees that the agency actions challenged here are reviewed under the APA's deferential standard of review. Fed. Br. at 16-17. Under that standard, an agency action may be set aside as arbitrary and capricious only if the agency "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Bos. Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). "Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency." *Daley*, 127 F.3d at 109. *Id*. As long as the agency's decision "is reasonably supported by the administrative record, [the Court's] inquiry must end." *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1448 (1st Cir. 1992).

8

When, as here, the case involves agency decisionmaking of a "scientific and technical nature," the level of deference is increased. *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (cleaned up). Agencies are owed "an extreme degree of deference" when they are "evaluating scientific data within [their] technical expertise," *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 21 (1st Cir. 2012), and the court "must defer to [their] informed discretion." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

The District Court's grant of summary judgment to Vineyard Wind and the Federal Defendants was fully supported by applicable law and the administrative record. Residents provide no reason to disturb that decision.

The 2021 biological opinion incorporated the best scientific and commercial data available, and it adequately discussed every study and piece of salient information that Residents say was overlooked. *See infra* at 10-19, 31.

The biological opinion's conclusion that the Project, with mitigation measures, is not likely to jeopardize the continued existence of the North Atlantic right whale is well reasoned and well supported by the administrative record. Residents' arguments that the mitigation measures are inadequate were in many instances not raised below, and they lack merit in any event. *See infra* at 19-28.

Finally, BOEM complied with NEPA by reasonably relying on NMFS' biological opinion and taking a hard look at the Project's impact on the North Atlantic right whale. *See infra* at 11, 29-30

## ARGUMENT

## I. Federal Defendants Used the Best Scientific and Commercial Data Available and Their Interpretations of that Data are Afforded Significant Deference

The District Court properly held that the 2021 biological opinion incorporated the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), and that Federal Defendants are owed significant deference on this question.[1] ADD. 39-40. The record

---

[1] As Federal Defendants explain, NMFS issued a biological opinion in September 2020 concluding that the project is not likely to jeopardize the existence of any listed species. Fed. Br. at 12. BOEM and NMFS subsequently reinitiated consultation to consider the effects of a number of ecological monitoring surveys that BOEM required Vineyard Wind to

contradicts Residents' claim that "NMFS and BOEM failed to consider
certain salient information." Br. at 15. As Federal Defendants explain,
the biological opinion considered each study and document identified in
Residents' brief, and BOEM properly relied on NMFS's expert opinion in
approving the Project. Fed. Br. at 17-47. The District Court correctly held
that Residents' disagreement with "NMFS's conclusions after review of
that data" is not a valid reason for the court to "second-guess NMFS's
considered determinations." ADD. 40; *see, e.g., Lovgren v. Locke*, 701 F.3d
5, 38 (1st Cir. 2012) (disagreement with agency's "conclusion is not a
basis for deeming it invalid").[2]

---

do as a condition of approval of the construction and operations plan and
that were not evaluated in the 2020 biological opinion. In addition to
assessing the impact of those surveys, NMFS considered updated
information related to right whales. SA_0369, SA_0337-59. The renewed
consultation ended in October 2021 when NMFS issued a new biological
opinion that replaced the 2020 biological opinion and again concluded
that the project is not likely to jeopardize the continued existence of any
listed species. The 2021 biological opinion is the one that is currently in
effect and being challenged in this case.

[2] To the extent that Residents are arguing that the ESA requires NMFS
to give the species the "benefit of the doubt" when deciding what data is
the "best scientific and commercial data available" (Br. at 14), the
argument is both forfeited and incorrect. It is forfeited because Residents
did not raise it in the district court. *See Hoolahan v. IBC Advanced Alloys
Corp.*, 947 F.3d 101, 114 (1st Cir. 2020). It is incorrect because the
"benefit of the doubt" language comes from the House Conference Report

## A. The Biological Opinion Considered The Quintana-Rizzo Study

Residents' assertion that the Quintana-Rizzo 2021 study contains "multifarious critical facts" that should have been considered in the 2021 biological opinion, Br. at 15, is inaccurate. The biological opinion cites Quintana-Rizzo nine times, and substantively considers its data and analysis. *See* SA_0483, SA_0485, SA_0550-51, SA_0656; Fed. Br. at 22-24, 44-45.

First, the biological opinion acknowledged Quintana-Rizzo's findings about a "recent shift[] in right whale distribution and foraging behavior." Br. at 15. Among other things, it cites Quintana-Rizzo's conclusions that "right whale occurrence increased during the study period with whales sighted in the area nearly every month since 2017," and that "the study area … could be a feeding location for whales that stay in the mid-Atlantic and north during the winter-spring months and a stopover site for whales migrating to and from the calving grounds."

---

and should not be read to qualify or override the agencies' statutory responsibility to use the "best scientific and commercial data available." *See, e.g., Maine Loberstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 586 (D.C. Cir. 2023); *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1266-67 (11th Cir. 2009).

SA_0483; *see also* SA_0656 ("During spring (March-May) seasons in 2011-2015 and 2017-2019, the [wind development area] has been a high use area for right whales, with both feeding and socializing activities observed (Leiter et al. 2017, Quintana-Rizzo et al. 2021)").

Second, the biological opinion *does* address Quintana-Rizzo's "hotspot" analysis, contrary to Residents' claim. Br. at 18. It is important to note that Quintana-Rizzo shows no right whale "hotspot" in the Project Area during the summer months which are the height of the construction season. Below is Quintana-Rizzo's Figure 5, showing that all of the summer "hotspots" were outside of the Vineyard Wind's lease area (designated as "4" on the map) and were, instead, in the Nantucket Shoals to the east.



Appx.000457. The biological opinion acknowledges this, saying that the "high use areas (hotspots) are primarily nearby, but outside, the footprint

of the [wind development area], except for during the spring (Quintana-Rizzo et al. 2021)." SA_0656. To protect right whales, Vineyard Wind is not permitted to construct the wind turbines in most of the spring (March and April) and must employ additional mitigation measures in May to avoid pile driving when right whales may be present. SA_0394, SA_1778 (no pile driving from January 1 to April 30); SA_1781 (Vineyard Wind must have "an enhanced survey plan for May 1 through May 31 to minimize the risk of exposure of NARWs to pile driving noise"); SA_1784-85 (expanded clearance and monitoring zones required for pile driving in May).

Third, Residents erroneously fault the biological opinion for omitting the supposedly "critical fact" that Quintana-Rizzo "identified 327 unique" right whales, purportedly 93% of the total population, in "the RI/MA wind energy area." Br. at 16. Residents appear to think that fact is "critical" because it shows that "[n]early all of the remaining" right whales use the area "as a feeding area." *Id.* The biological opinion accurately described Quintana-Rizzo's information and conclusions on that issue.

Quintana-Rizzo tallied record sightings of right whales "in southern New England"—an area much larger than Vineyard Wind's Project Area—over the eight-and-a-half year period "between March 2011 and December 2019." Appx.000451 (Figure 1), Appx.000455. In discussing the sightings, Quintana-Rizzo said that "[f]eeding was recorded on more occasions (n = 190 occasions) than socializing (n = 59 occasions)." Appx.000455. The biological opinion quotes that finding, SA_0551, and acknowledges that the area is used for feeding, foraging and socializing, SA_0656.

Fourth, Residents misread Quintana-Rizzo's sighting rate chart, believing it to indicate that the *number* of whales sighted in August 2019. Br. at 16-17 (claiming that the sighting rate chart indicates that "[a]pproximately 25 NARWs were sighted in August in 2019") (footnote omitted). The sighting rate is "the number of right whales sighted per 1000 km of survey effort on a per-month basis." Appx.000452. Regardless of the number, the biological opinion acknowledged that "in recent years right whales have been observed in the Nantucket Shoal region starting in August and staying through the winter." SA_0656 (citing Quintana-Rizzo et al. 2021 and other sources).

Finally, it bears noting that Quintana-Rizzo made no finding that the mitigation measures imposed on Vineyard Wind are inadequate to protect right whales from exposure to harmful levels of pile driving noise. That was not because the authors were unaware of Vineyard Wind's Project. Quite the contrary, the authors summarized the mitigation measures for Vineyard Wind's Project and said that "[i]mplementing mitigation measures by *all* lease-holding companies will be crucial." Appx.000463 (emphasis added). They concluded with a recommendation for additional study to "reduce uncertainty" and "inform appropriate strategies for *future* offshore wind development." *Id.* (emphasis added).

For these reasons, and those explained in more detail in Federal Defendants' brief, the 2021 biological opinion considered the information and conclusions in the Quintana-Rizzo study and appropriately concluded that the Project is not likely to jeopardize the continued existence of the right whale.

## B. The Biological Opinion Considered the "Key Outcomes Memorandum" and Entanglement Risks, The "2020 Annual Report Card," And The "2020 Stock Assessment."

Vineyard Wind adopts Federal Defendants' demonstration that the 2021 biological opinion:

(1) considered the "Key Outcomes Memorandum" and fully considered the risks that right whales will become entangled in fishing gear, *see* Fed. Br. at 35-39;[3] and

(2) considered the North Atlantic Right Whale Consortium 2020 Annual Report Card (authored by Pettis, et al.) and the 2020 marine mammal stock assessment (authored by Hayes, et al.) and accurately described the population trends and overall status of the North Atlantic right whale; *see* Fed. Br. at 19-21.

Vineyard Wind also agrees with Federal Defendants that Residents have waived any claim that the biological opinion is deficient for not citing the "potential biological removal" metric. *See* Fed. Br. at 46. The District Court held that Residents waived their argument regarding the

---

[3] To the extent Residents seek to rely on record evidence or findings from a recent D.C. Circuit case regarding right whale entanglement mortalities and injuries from fishing gear in Maine, that argument is improper. *See* Br. at 29 (citing *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 587 (D.C. Cir. 2023)). As discussed, *see infra* at 17-20, Residents cannot raise new arguments or cite new, non-record evidence on appeal. But, even if it could, the record in *Maine Lobstermen's Association* involves areas far north of the Project Area. *See* 70 F.4th at 587, 589 (discussing right whale entanglement risks in the Gulf of Maine, Bay of Fundy, and the Gulf of St. Lawrence). That evidence regarding Maine waters does not contradict the extensive review of right whale entanglement risks presented in the 2021 biological opinion and discussed in Federal Defendants' brief.

potential biological removal metric for failing to raise it in a 60-day notice letter, ADD. 35, and Residents declined to challenge that ruling in their Opening Brief, so their argument about, and repeated references to, the potential biological removal metric argument are doubly waived. *See* Br. at 8, 19, 33-34. Moreover, Residents do not challenge the District Court's finding "that the Record reflects NMFS did consider the right whale's survival rate, even if it did not discuss [potential biological removal] specifically." ADD. 41.

## C. The Biological Opinion Considered the Stober Paper And Properly Analyzed The Potential Impacts From Operational Noise

Residents err in stating that the 2021 biological opinion failed to provide a satisfactory explanation for relying on the Elliott, *et al.* (2019) study instead of the Stober and Thompson (2021) paper on wind turbine operational noise. Br. at 21, 30-33. The biological opinion made more than a "transient reference to the Stober study." Br. at 32. As Federal Defendants' brief explains, the biological opinion described the modeling used in the Stober study and explained the reasons for NMFS's determination that it was not predictive of the noise impacts of Vineyard Wind's Project. Fed. Br. at 40-42. This is the type of prediction, made

18

within the agency's "area of special expertise" and "at the frontiers of science," when "a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983); *see also, e.g.*, *Upper Blackstone*, 690 F.3d at 26 ("Where the agency follows the proper procedures and acts with a reasonable basis, both its choice of scientific data and interpretation and application of that data to real world conditions are entitled to deference").

## II. The Administrative Record Supports The Conclusion That The Project, With The Mitigation Measures, Is Not Likely To Jeopardize North Atlantic Right Whales

Residents argue that the Project's mitigation measures are deficient in several respects. Some of these arguments are waived and all lack merit.

### A. Residents' Challenges To The Monitoring And Clearance Zones Are Both Waived and Without Merit.

Residents argue that North Atlantic right whales will be harmed by pile-driving noise because the clearance and shutdown zones around the pile-driving sites during the portion of the construction season that occurs between June 1 and October 31 are too small. Br. at 22-24. This argument is waived because the District Court held it was waived below, and Residents have not appealed that holding. It also lacks merit.

The District Court held that "Plaintiffs have waived claims regarding the sufficiency and size of the clearance zones" because they did not include it in their 60-Day Intent to Sue Letter to Federal Defendants as required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(A)(ii). ADD. 34 & n.11, ADD. 37; *cf. Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 29-30 (1st Cir. 2001) ("The notice provision provides agencies with an opportunity to resolve the dispute and take any necessary corrective measures before a resort to the courts," and "the notice must adequately inform the agency of the exact grievances against it, if it is to fulfill this purpose."). Residents did not challenge that holding in their Opening Brief, and thus have forfeited any right to do so in their reply. *See, e.g., Vasquez-Rivera v. Figueroa*, 759 F.3d 44, 47 (1st Cir. 2014) ("reiterating that arguments not made in a party's opening brief are deemed waived"); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("An argument not seriously developed in the opening brief is forfeit.").

That should be the end of the matter, but Residents' argument is also wrong on the merits. Residents argue that the 5 km PAM monitoring and clearance zones and 3.2 km shut-down zone in place from June

through October are too small because "the Level A harassment ensonified area extends out to 7.25 km from the pile driving."[4] Br. at 22-23. In Residents' view, this means that '[w]hales swimming outside the 3.2 km shut-down zone but within the 7.25 km Level A noise contour will be exposed to Level A noise."[5] *Id*. at 23. Residents are mistaken.

First, Residents are confusing two different types of Level A exposures: "peak" and cumulative or "SEL." Level A "peak" is the distance from the pile in which a whale could suffer permanent injury from pile driving noise by just swimming into the area, while "SEL" is the distance at which a whale would be harmed by *cumulative* exposure to all the pile-driving in a 24-hour period. SA_0512, SA_0532. The 7.25 km radius is a cumulative-exposure Level A zone; it "does not represent the area in which [permanent injury] would occur simply if an animal enters the zone." SA_0044.

---

[4] "Level A harassment" is another term of art from the Marine Mammal Protection Act. It is defined as "any act of pursuit, torment, or annoyance that has the potential to injure a marine mammal or marine mammal stock in the wild." SA_0528.

[5] For reference, the 5 km clearance zone is about 3.11 miles; the 3.2 km shutdown zone is about 1.99 miles. The 7.25 km Level A ensonified area is about 4.5 miles. During November, December and May, the clearance zone expands to 10 km (about 6.21 miles). SA_1784-86.

The zone for Level A "peak" harassment is just 4 meters for pile-driving the piles in the jacket foundation and 17 meters for the monopile foundations. SA_0531 (Table 7.1.9). Residents do not (and could not) argue that the 5 km PAM monitoring and clearance zones and 3.2 km PAM shutdown zones for June 1 through October 31 are too small to detect a whale within 17 meters of the pile driving.[6]

Second, the mitigation measures are also sufficient to avoid cumulative Level A harassment. The overwhelming majority of the pile driving will be done to install the monopile foundations for the Project's 62 wind turbines.[7] The zone for cumulative exposure to pile-driving of the monopiles used for the foundations of the 62 wind turbines is 3.2 km,

---

[6] Indeed, PSOs must err on the side of caution, and "[a]ny large whale sighted by a PSO within 1,000 m of the pile that cannot be identified to species must be treated as if it were a North Atlantic right whale." SA_0541. Furthermore, "a PAM detection (75% confidence) of the NARW within the PAM clearance zone must be treated as a visual detection, triggering a delay in pile driving." SA_0542.

[7] The biological opinion calculated the number of whales likely to be harassed due to exposure to pile driving noise based on a "maximum impact scenario" for a project with 90 monopile foundations and 12 jacket foundations, but acknowledged that the actual numbers would be lower if the project actually had "fewer piles requir[ing] less pile driving." SA_0749. Vineyard Wind ultimately chose a project design that has 62 wind turbines. Doc. 118 ¶ 95.

SA_0532—a distance that is covered by the monitoring, clearance and shutdown zones. *See* SA_0541-42 (Table 7.1.18b).

The "7.25-km Level A noise contour" referenced by Residents (Br. at 23) is the zone for Level A harassment from *cumulative* exposure for pile driving the jacket foundation *if* all four piles in the jacket are installed within a 24-hour period. *See* SA_0530-31 (Table 7.1.9), SA_0516. The jacket foundation is used for the Project's one electrical service platform.[8] The possibility that pile driving for all four piles in the jacket would be completed within a 24 hour period between June and October; that a right whale would be swimming within 7.25 km of the pile driving but outside the 5 km monitoring and clearance zone and the 3.2 km shutdown zone for the entire time that all four piles were being driven without being seen or detected; and that the whale would get a permanent injury that would jeopardize the continued existence of the

---

[8] The jacket foundation has four piles, each of which is 3 meters (9.8 feet) in diameter. In contrast, the monopile used in the wind turbine foundations is 10.3 meters (33.8 feet) in diameter. *See* SA_0516.

[8] As NMFS explained, "marine mammals are expected to move away from a sound source that is annoying prior to exposure resulting in a serious injury and avoid sound sources at levels that would cause hearing loss." SA_0549 (citing Southall et al. 2007, Southall et al. 2016).

species is so remote and speculative that NMFS did not have to take further action to mitigate it.[9]

Indeed, the modeling NMFS used to estimate that 1.39 right whales might be subject to Level A cumulative harassment from pile-driving noise assumed that the Project would be constructed with a "maximum design scenario" with 90 monopiles and 12 jacket foundations, and two foundations installed per day with 6 dB of noise attenuation. SA_0515-18, SA_0534, SA_0539. NMFS concluded that Level A harassment "will be avoided through enhanced mitigation and monitoring measures" designed "specifically to minimize potential right whale exposures," including the "seasonal moratorium on pile driving from January through April and enhanced clearance measures from November through December and May 1 through May 14." SA_0539.

Beyond that, the risk of Level A harassment will be further reduced because Vineyard Wind is installing 62 wind turbines, Doc. 118 ¶ 95, so will not need the "102 days of pile driving" Residents fear would be

---

[9] As NMFS explained, "marine mammals are expected to move away from a sound source that is annoying prior to exposure resulting in a serious injury and avoid sound sources at levels that would cause hearing loss." SA_0549 (citing Southall et al. 2007, Southall et al. 2016).

needed based on the maximum design scenario. Br. at 24. As the biological opinion explains, the estimated "amount of take of whales" is "proportional to the amount of pile driving," so a reduction in the number of wind turbines will result in a proportional reduction in the number of animals exposed to pile-driving noise. SA_0749; *see also* SA_0750 (illustrating fewer wind turbines will result in a proportional "reduction in exposure"). Whatever risk may theoretically remain is so small that it was reasonable for the biological opinion to conclude that "exposure of any right whales to … Level A harassment is extremely unlikely to occur." SA_0539-40.

## B. Mitigation Measures Will Avoid Level A Harassment and Minimize Level B Harassment

Residents attack NMFS and BOEM's reliance on Protected Species Observers and Passive Acoustic Monitoring by citing purported factual findings from two cases, *NRDC v. Pritzker*, 62 F. Supp. 3d 969 (N.D. Cal. 2014), *rev'd and remanded by* 828 F.3d 1125 (9th Cir.) and *Native Village of Chickaloon v. National Marine Fisheries Service*, 947 F. Supp. 2d 1031 (D. Alaska 2013). Br. at 24-27. That attack is improper, and the argument forfeited, because Residents did not present these purported "facts" in their 60-day notice letters, in comments to the Federal Defendant

agencies, or in the District Court.[10] *See* Fed. Br. at 33-34, n.15 (explaining why the argument is forfeited). And even if it were not forfeited, the argument would fail because the cases involve different projects and different records. Residents have not cited anything in this record demonstrating that the mitigation measures used by Vineyard Wind are deficient. *See, e.g., City of Taunton v. EPA*, 895 F.3d 120, 127-28 (1st Cir. 2018) (court's task "is to determine whether, on the basis of the record before it, [the agency] acted arbitrarily or capriciously" so it cannot rely on "scientific and factual averments" that "were not part of the underlying agency decision") (cleaned up).

With respect to their other arguments against the mitigation measures, Residents continue to attack *individual* mitigation measures as being less than 100% effective, without considering them collectively.

---

[10] Residents assert that they "thoroughly discussed" the limitations of at least Passive Acoustic Monitoring in their summary judgment briefing. But they never discussed, or cited to, the *Pritzker* or *Native Village of Chickaloon* decisions in their briefing. Their attack relied on Barkaszi, *et al.* (2020), a paper outside of the administrative record that fails to support their allegations. *See* Plaintiffs' Opposition, Doc. 105 at 4-6. Because the paper was not in the administrative record, and Residents failed to move to supplement the record, the District Court declined to consider it. ADD. 38 n.12. Residents do not challenge that ruling on appeal.

The District Court rightly rejected that argument. As the District Court held, seasonal restrictions on pile driving, Protected Species Observers, Passive Acoustic Monitoring, and other measures, should be assessed as interlocking and overlapping safeguards.[11] *See* ADD. 44 (reviewing "the suite of measures as a whole" and "not the measures in isolation"). Residents do not cite to anything in the administrative record indicating that, if these mitigation measures are employed together, construction of the Project will cause Level A harassment or will cause Vineyard Wind to exceed the estimated number of Level B harassment takes.

## C. The Mitigation Measures Ensure That Project Vessels Will Not Strike Right Whales

Vineyard Wind incorporates Federal Defendants' arguments that NMFS considered the risks of vessel strikes from Project vessels and took measures to avoid them. Fed. Br. at 42-43.

## D. Residents Provide No Basis to Contest the "Soft Start" Procedure

Residents' complaints about the "soft start" procedure are based on a misunderstanding of the purpose of the procedure and the

---

[11] Vineyard Wind is subject to 33 mitigation measures to protect marine mammals. *See supra* at 3-7; SA_1383-1403.

administrative record. As Federal Defendants explain, the "soft start" process provides a warning to any marine mammals that may not have been detected through other mitigation measures and provides them an opportunity to leave the area. Fed. Br. at 34-35. Residents claim the soft start procedure's "efficacy is far too low to result in an impact to the total take estimate of NARWs." Br. at 27. Yet, the District Court correctly held that "NMFS *disclaimed* any reliance on soft-start procedures in its conclusions about the anticipated level of take by harassment of right whales" and it "has no impact on the 2021 BiOp's take assessment." ADD. 46 (emphasis added); *see also* SA_0571 (NMFS was "not able to modify the estimated [take numbers] to account for any benefit provided by the soft start"). In other words, even if the soft start procedure was deemed ineffective, it would not invalidate any agency action challenged here. Thus, Residents' argument that "there's no empirical evidence" that the soft start process "works," Br. at 27, is irrelevant. Without showing that the Federal Defendants relied on the soft start process to reach a conclusion (*e.g.*, a "no jeopardy" finding, the selection of a Final EIS alternative, or the number of authorized Level B takes), Residents' claim fails.

### E. Residents' Argument that Federal Defendants Failed to Establish an Adequate Baseline Misreads the District Court's Opinion and Lacks a Record Basis

Residents' argument that the "District Court contends there is no statutory or regulatory requirement to conduct a baseline analysis," Br. at 32, is puzzling. The District Court did not hold— nor did the parties even argue—that the Endangered Species Act does not require a description of a species' baseline condition. And, although the Federal Defendants contested whether NEPA requires a similar baseline description, the District Court held that the Final EIS' extensive discussion of the current state of the right whale satisfies any NEPA baseline requirement. ADD. 51-52 (citing SA_1108-13). Residents demonstrate no error in either baseline.

As Federal Defendants explain (at 18-24), the 2021 biological opinion contains an extensive discussion of the North Atlantic right whale's baseline, including their habitat and migration patterns, how their distribution is linked to a particular zooplankton used for food, recent changes in right whale distribution, and their seasonal presence in the Project area. SA_0481-84. Separately, the biological opinion discussed the most recent right whale population data, described the

Unusual Mortality Event,[12] the key challenges to the species (*e.g.*, vessel strikes and entanglement in U.S. and Canadian waters, as well as climate change), and reproductive challenges. SA_0716-20. Thus, the District Court concluded that, with respect to the Endangered Species Act baseline, "Plaintiffs have not raised any issues regarding the environmental baseline that Defendants entirely failed to consider," including issues raised in the Quintana-Rizzo study. ADD. 50 (internal quotations omitted). Residents identify nothing in the record to contradict the District Court's findings.

With respect to the Final EIS baseline, the District Court held—and Residents do not seriously dispute—that the "No Action Alternative" described the current state of North Atlantic right whales, including the issues discussed in the 2021 biological opinion. ADD. 51. As Federal Defendants explain, Residents have not identified anything in the administrative record that BOEM ignored. Fed. Br. at 47-51.

---

[12] An "Unusual Mortality Event" is defined under the Marine Mammal Protection Act as "a stranding that (A) is unexpected; (B) involves a significant die-off of any marine mammal population; and (C) demands immediate response." 16 U.S.C. § 1421h(9). NMFS declared an Unusual Mortality Even for North Atlantic right whales in 2017. SA_0421-22.

## F. The 2021 Biological Opinion Includes an Appropriate Recovery Analysis

Residents' argument that the 2021 biological opinion "entirely omits" a "proper recovery analysis" ignores the opinion's discussion of the right whale's challenges and prospects for recovery. SA_0716-20. Residents claim that this analysis "merely assumes the project's mitigation measures will be enough to prevent project-related impacts from impairing recovery." Br. at 34-35 (internal quotations omitted). But this argument repeats Residents' various unsupported protests against the mitigation measures. *See supra* at 19-28.

## CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to Vineyard Wind and Federal Defendants on all claims should be affirmed.

November 20, 2023                    Respectfully submitted,

David T. Buente, Jr.                    /s/ Jack W. Pirozzolo
Peter C. Whitfield                       Jack W. Pirozzolo (No. 61887)
James R. Wedeking                    SIDLEY AUSTIN LLP
Kathleen Mueller                        60 State Street, 36th Floor
Brooklyn Hildebrandt                  Boston, MA 02109
Sidley Austin LLP                        (617) 223-0304
1501 K Street, N.W.                     jpirozzolo@sidley.com
Washington, DC 20005

*Counsel for Vineyard Wind 1 LLC*

32

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,082 words, excluding the parts exempted by Rule 32(f).

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Century Schoolbook font.

Date: November 20, 2023          /s/ Jack W. Pirozzolo
                                 Jack W. Pirozzolo

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of November 2023, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo
